American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the COX-2 inhibitor "tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events." Bing, R. & Lomnicka, M. Why Do Cyclo-Oxygenase-2 Inhabitors Cause Cardiovascular Events, J.A.C.C. 39:3, Feb. 6, 2002.

90.     On August 21, 2001, the day before the JAMA article was published, Bloomberg News reported that, in anticipation of the publication of the Cleveland Clinic Study findings, Merck, through its Senior Director of Cardiovascular Clinical Research, Laura Demopoulos, commented:  "We already have additional data beyond what they cite, and the findings are very, very reassuring. Vioxx does not result in any increase in cardiovascular events compared to placebo."

91.     Defendants not only falsely disparaged the Cleveland Clinic's findings prior to their release, but, according to a Wall Street Journal article dated August 22, 2001, Merck had previously taken affirmative steps to suppress publication of the Cleveland Clinic Study results. According to The Wall Street Journal article, the JAMA article's "release follows an unusual behind-the-scenes push by [Merck] to lobby the prominent cardiologists who wrote the study and the journal that published it . . . . Merck sought to downplay the cardiac issue -- in meetings in New York and Cleveland with Cleveland Clinic Doctors, in e-mails and in phone calls to the Cleveland doctors and the editor of JAMA."

92.     Also, according to The Wall Street Journal, Merck's Vice President of Medical Communications, Laurence Hirsch, asked JAMA to carry a rebuttal article to accompany the publication of the Cleveland Clinic's findings. The Wall Street Journal

quoted Dr. Topol, one of the JAMA article's authors: "It was quite extraordinary and almost humorous that the company would do this."

93.   In addition, on August 23, 2001, the day after the release of the JAMA article. Defendants continued to misrepresent Vioxx's cardiovascular risks by stating in a press release that "the Company stands behind the overall and cardiovascular safety profile . . . of Vioxx."

94.   Immediately after the publication of the JAMA article, Defendants also sent, by Federal Express, "Dear Doctor" letters to physicians throughout the country disparaging the article as "not based on any new clinical study arid assuring the physicians that Merck "stands behind the overall and cardiovascular safety profile" of Vioxx.

95.   Merck further responded to the JAMA study with a bulletin directing its sales representatives to reassure physicians by using the scientifically inappropriate Cardiovascular Card or other obfuscating methods.

96.   On September 17, 2001 Thomas W. Abrams, R.Pb., MBA. Director of the Food and Drug Administration Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, then President and CEO of Merck as well as Chairman of Merck's Board. relating to "promotional activities and materials for the marketing of Vioxx (Rofecoxib) tablets."

97.   In addition to the incidents addressed *supra;* the Warning Letter stated that Merck had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MI's) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (Naproxen).

98.   The eight (8) page Warning Letter outlines, in detail, the conduct of Merck that supports the Food and Drug Administration's issuance of the Warning Letter, and the following "Conclusions and Requested Actions":

> The promotional activities and materials described above minimize the potentially serious Cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx / Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.
>
> Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.
>
> This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:
>
> Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.
> Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.
>
> A written statement of your intent to comply with "'I" in "2" above.

99.   In the Fall of 2001, Merck launched "Project Offense" as a formal marketing strategy to emphasize Vioxx efficacy and safety.  In training sales

representatives for this offensive strategy, Merck referred to physician concerns regarding cardiovascular safety as "obstacles." Merck reinforced this characterization by preparing a training program entitled "Obstacle Response Guide for Vioxx."

100. Merck also contemporaneously prepared a training program entitled "Dodge Ball Vioxx" for which most of the training manual's 16 pages stated a sample physician statement, such as "I am concerned about the cardiovascular effects of Vioxx" and "[t]he competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than Celebrex," and then stating a Merck-approved "dodge" response. The final four pages of this document tellingly read, in their entirety as follows:

DODGE!!

DODGE!!

DODGE!!

DODGE!!

101. Merck's sales representatives were trained and advised to "dodge" and overcome these safety "obstacles" by comparing Vioxx and aspirin and then directed to review the scientifically inappropriate Cardiovascular Card with the physician in its entirety.

102. Merck's sales representatives were also directed, and did refer physicians with persistent questions to its medical services department. Merck's written responses made use of the same scientifically inappropriate data used for the Cardiovascular Card.

103. On November 6, 2001, Merck's Vice President of Clinical Research, Dr. Alise Reicin, and others authored an article in defense of Vioxx's cardiovascular

risk profile entitled "Cardiovascular thrombotic events in controlled, clinical trials of Rofecoxib" in the journal *Circulation*. Dr Reicin and her fellow authors summarized their Vioxx assessment as follows:

> This analysis provides no evidence for an excess CV [cardiovascular] events for Rofecoxitb relative to either placebo or the non-Naproxen NSAIDs that were studied. Difference observed between Rofecoxib and Naproxen are likely the result of antiplatelet effects of the later agent.

104.    The FDA's September 17, 2001 Warning Letter, as detailed *supra,* explicitly addressed this position as part of a "promotional campaign for Vioxx that minimizes potentially serious cardiovasrular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile of Vioxx." As the FDA explained:

> Although the exact reason for the increased rate of MI's observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MI's. You assert that Vioxx does not increase the risk of MI's and that the VIGOR study is consistent with Naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that the explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties

105.    On January 12, 2002, Vanderbilt University researchers headed by Dr. Wayne Ray published an article entitled "Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease An Observational Cohort Study," in the journal *The Lancet.* The article posited an explanation as to how COX-2 inhibitors promote thromboembolic events.

106.    Following Dr. Ray's article, on January 15, 2002, Merck employees led by Dr. Reicin published an article entitled "Comparison of cardiovascular thrombotic events in

patients with osteoarthritis treated with Rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs (Ibuprofen, Diclofenac, and Nabumetone), in the *American Journal of Cardiology.* The Vioxx-supporting Merck authors concluded that "an analysis from the Rofecoxib osteoarthritis development program found no difference between Rofecoxib, comparator nonselective NSAIDs, and placebo in the risks of cardiovascular thrombotic events."

107.    On April 11, 2002, the FDA approved a supplemental application for the use of Vioxx for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain. The FDA also approved new labeling, a "Dear Doctor" letter and a new patient package insert. The labeling and the "Dear Doctor" letter contained inadequate information concerning the results of the VIGOR study in the manner as prior labeling as discussed *supra.*

108.    The revised labeling further states that the administration of Vioxx 50 mg was associated with a higher incidence of gastrointestinal symptoms:

> *Clinical Studies in OA and RA with Vioxx 50 mg (Twice the highest dose recommended for chronic use)*
>
> In OA and RA clinical trials which contained Vioxx 12.5 or 25 mg as well as Vioxx 50 rug, Vioxx 50 mg OD was associated with a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn. nausea and vomiting), lower extremity edema, hypertension, serious 'adverse experiences and discontinuation due to cynical adverse experiences compared to the recommended chronic doses of 125 and z5mg (see DOSAGE AND ADMINISTRATION).

109.    The "Dear Doctor" letter, approved in conjunction with the revisions to the Vioxx labeling, merely outlined the changes to the Vioxx labeling.

110.    Merck's revised labeling remained misrepresentative and ineffective because it failed to disclose the truth with respect to Vioxx's adverse

44

cardiovascular safety profile despite the VIGOR Study, the ADVANTAGe study and studies 085 and 090 having made Merck well aware of the cardiovascular risks posed to the consuming public.

111. In negotiating the new label with the FDA, Merck successfully avoided the identification of cardiovascular risks with a "warning" label and instead relegated the risks to the lesser "precautions" section. Merck successfully refused to employ the method identified by the FDA as the best to clearly label cardiovascular risk information. Merck further coerced a statement within the label stating that the significance of the VIGOR study and two other studies was "unknown."

112. Following the new Vioxx labeling in April 2002, Merck modified its directives to its sales representatives. Merck continued to prohibit sales representatives from discussing new cardiovascular data but now replaced the scientifically inappropriate Cardiovascular Card with language emphasizing the misleading "unknown" cardiovascular risk reflected by the specific studies identified on the new label.

113. Merck employed approximately 3,000 of these sales representatives for the purpose of marketing Vioxx to physicians. Merck trained these sales representatives to misinform physicians through affirmative material misrepresentations and omissions, including Plaintiffs' prescribing physicians regarding the health risks associated with Vioxx ingestion Merck directed its sales representatives to enact this marketing scheme with the intent that the targeted physicians prescribe Vioxx to their patients without adequate knowledge of the drug's risks.

114.  Merck trained its sales representatives in a manner providing them knowledge of the risks inherent to Vioxx ingestion and in a variety of medical topics including pharmacology, anesthesiology, rheumatology and pain management. Merck intended that these well-trained sales representatives would be better able to communicate materially false and misleading statements and omissions to their physicians clients, to make these statements in a manner denying these prescribing physicians' knowledge of the danger that they unwittingly passed onto their patients and with the intent that physicians and their patients rely upon this false information.

115.  Merck further trained its sales representatives in a variety of selling techniques and ensured that the representatives possessed the verbal and non-verbal interpersonal communications skills necessary to convincingly communicate its materially false and misleading sales message.

116.  Merck furthered its materially false and misleading marketing scheme, enacted through its sales representatives, to selectively present physicians only with that medical literature that favored Merck products. Some Merck sales training materials referred to such literature as "approved" articles. Contrary articles, called "background" in the same context, were not approved for use with physicians. Merck advised its sales representatives that "this information cannot be used, and the articles cannot be referenced, during sales discussions with your customers." Merck further warned its sales representatives that the use of "background" articles constituted "a clear violation of Company Policy."

117.  Merck closely tracked physician prescription practices and assigned individual physicians a "Merck potential" defined as a "dollar estimate of each prescriber's

total prescribing volume that can realistically be converted to Merck products." Merck's sales representatives were advised that their bonuses would reflect overall sales figures. Merck provided these figures in a manner permitting its sales representatives to directly correlate their physician-client's prescriptions to bonus money.

118.    Merck also trained its sales representatives to coordinate speaker programs, sometimes referred to as Health Education Learning (HEL) programs, based upon the speaker's favorable view of Merck products and influence among other physicians. Merck paid a physician up to $2,000 per engagement for delivering these favorable views.

119.    Merck further denied physicians knowledge of Vioxx's cardiovascular risks by retaliating against speakers who spoke of the drugs risks.   For example, Merck canceled several presentations it had been scheduled to sponsor when Dr Gurkirpal Singh of Stanford University, a prominent COO-2 expert, began commenting in his lectures that that the corporation was concealing VIGOR data.

120.    In another example, Merck brought suit against   Dr. Joan-Ramon Laporte of the Catalan Institute of Pharmacology in Barcelona, Spain.  When the court ruled against the corporation, Merck cancelled its $140,000 sponsorship of an annual event at which Dr. Laporte was to be a featured speaker.

121.    Merck's marketing efforts at the sales representative level continued unabated as well.  For example, in 2003, Merck launched "Project Power Play" to focus on efficacy in order to "gain or extend" dominance in the market.

122.    Merck also continued directing its sales representatives with regard to misrepresenting Vioxx safety and to diverting physicians questions. For example, on September 17, 2003, Merck directed its sales representatives to respond to a pending American College of Rheumatology abstract identifying an increased risk of heart attack in

47

Vioxx patients by not initiating related discussions and by referring to the "unknown" language as stated on the drug's label leaflet.

123. In the face of further adverse articles, Merck also continued its Vioxx defense efforts with Dr. Reicin and her Merck colleagues publishing an article entitled "Selective COX-2 inhibition and cardiovascular effects: a review of the Rotecoxib development program" published in the October 1, 2003 edition of the *American Heart Journal.* Dr. Reicin and her colleagues continued to assert the Merck marketing line as follows:

> Rofecoxib was not associated with excess CV [cardiovascular] thrombotic events compared with either placebo or non-Naproxen NSAIDs. Again. Naproxen appeared to be the outlier, suggesting a cardioprotective benefit of Naproxen
>
> The totality of the data is not consistent with an increased CV risk among patients taking Rofecoxib.

124. Merck continued asserting these positions despite the FDA's condemnation of the selectively asserted Naproxen theory and Defendants' own knowledge of Vioxx's cardiovascular risks.

125. On October 30, 2003, The Wall Street Journal published an article entitled "Vioxx Study Sees Heart-Attack Risk," which revealed that a Merck-funded study at Harvard University-affiliated Brigham and Women's Hospital in Boston (the "Brigham Study") found an increased risk of heart attack in patients taking Vioxx compared with patients taking Pfizer's drug Celebrex, and compared with patients not taking any painkiller. The article stated:

> Brigham & Women's Hospital rheumatologist and epidemiologist Daniel H. Solomon headed the study, which looked at records of 54,475 Medicare patients, all of them over 65. Researchers found that the apparent cardiac risk was greatest in the first 90 days in which a patient is taking Vioxx, which generically is known as Rofecoxib. In the first 30 days, the researchers found, Vioxx was

48

linked to a 39 increased heart attack risk compared with Celebrex.
Between 30 and 90 days; that increased relative risk was 37%.

126.    On November 2, 2003, in the face of the October 30, 2003 Wall Street
Journal article, Dr. Reicin, Executive Director of Clinical Research for Merck, publicly
denounced the study and announced: "In our placebo-controlled randomized trials, we
have found no significant difference between Vioxx and placebo."   Dr Reicin also
stated "Randomized clinical trials are the 'gold standard,' and this isn't such a trial."
By denigrating the study's methodology, Dr. Reicin's comments misled physicians and
the public acted to perpetuate the fraudulent concealment of Vioxx's cardiovascular
risks.

127.    Beginning in March 2004, however, Defendants modified Merck's
national direct-to-consumer television and print advertisements. Prior to March 2004,
those advertisements made no mention of any cardiovascular issues associated with
Vioxx. The new 2004 advertisements stated that, if a patient has "a history of heart
problems; that patient should consult with their physician before taking Vioxx."
This recommendation, however, further misled the public since Vioxx was a prescription
drug and could not legally be purchased without a consultation with a physician and
the tailored misrepresentations made to physicians by Merck sales representatives and
in publications meant that the new advertisements merely redirected consumers to
additional misleading information.

128.    On or about April 6, 2004, Defendants issued a new Vioxx label (the "Fourth
Vioxx Label") to reflect that Vioxx had been approved for the acute treatment of
migraine in adults.    Despite knowing Vioxx's cardiovascular risks through VIGOR,
ADVANTAGe, studies 085 and 090, and evidence available through the ongoing

49

Adenomatous Polyp Prevention on Vioxx (APPROVe) study and other sources, Merck prepared the Fourth Vioxx Label with essentially the same materially false and misleading statements concerning Vioxx's safety profile that were used in predecessor labels

129.    In addition to these false and misleading statements, the Fourth Vioxx Label included an addendum, entitled "Patient Information about Vioxx."    Although Defendants were aware or Vioxx's adverse cardiovascular safety profile -- that it significantly increased the risk of heart attack and cardiovascular events for healthy individuals as well as for those with pre-existing heart conditions -- the Addendum was materially false and misleading as it included a section on "Who should not take Vioxx," but failed to disclose that, as made clear by the withdrawal of Vioxx a little more than 5 months after the Addendum was issued, no patient should take Vioxx in the manner in which it had been marketed and prescribed by misled physicians.

130.    Merck additionally weakened the representations concerning "possible side effects" by the introductory statement set forth in the Addendum: "This leaflet does not take the place of talking with your doctor about your condition or treatment." Having trained sales representatives to "dodge" physician questions and otherwise misinform the prescribing physicians, Merck knew that this statement merely referred consumers to further erroneous information resulting from its misinformation-based marketing campaign.

131.    On August 22-25, 2004, at the 20th International Conference on Pharmacoepidemiology and Therapeutic Risk Management, David Graham, M.D., the Associate Director for Science and the FDA's Office of Drug Safety and the principal FDA investigator on a study performed to investigate the cardiovascular risk of the COX-2 selective

50

NSAIDs including Vioxx, made a poster presentation entitled "Risk of Acute Myocardial Infarction and Sudden cardiac Death with Use of COX-2 Selective and Non-Selective NSAIDs."

132. Dr Graham's presentation, taken from a Kaiser Permanente study under a contract funded by the FDA, concluded that Viox taken at more than 25 mg per day increased the risk of heart attack and sudden cardiac death by 300% in those enrolled in the study.

133. On August 26, 2004, Peter Kim, Dr. Scolnick's replacement as President of Merck Research Laboratories, issued a press release stating the following:

> Merck strongly disagrees with the conclusions of an observational analysis by Graham, et al., presented at an international medical meeting this week. Merck stands behind the efficacy and safety, including the cardiovascular safety of Vioxx.

134. On September 27, 2004, however, Merck informed the FDA that the Data Safety Monitoring Board for an ongoing long-term study of Vioxx, known as the Adenomatous Polyp Prevention on Vioxx (APPROVe) study, had recommended that the study be terminated early for safety reasons. As its names suggests, Merck did not initiate the APPROVe study as a cardiovascular risk assessment study. Instead, Merck initiated this study to determine Vioxx's effect on people with risk for developing recurrent colon polyps and expand the drug's applications to a new market segment.

135. Rather than offering further opportunity to exploit the NSAID market, however, Merck's APPROVe study demonstrated an increased risk of cardiovascular adverse events, including heart attacks and strokes for the Vioxx

population relative to the study's placebo population. This risk was particularly evident for people taking Vioxx for more than 18 months.

136.   On September 28, 2004, just over one month following Dr. Kim's reassertion of Vioxx's "cardiovascular safety" and strong disagreement with Dr. Graham's conclusions, Merck officials informed the FDA that it would withdraw Vioxx from the United States pharmaceutical market.

137.   On September 30, 2004, Merck finally announced in a "Dear Healthcare Professional" letter that Vioxx ingestion placed consumers at an increased risk for cardiovascular events, such as heart attack and stroke, and withdrew Vioxx from the market.

138.   Despite this belated admission, on the night of September 30, 2004, during an episode of the PBS Nightly Business Report, Merck continued its obfuscating scheme by falsely assuring the public that it had remained ignorant of Vioxx's cardiovascular risks until the APPROVe study. Former Merck Board Chairman Gilmartin falsely stated: "It was totally unexpected. But my instinctive reaction when Doctor Peter Kim called me to inform me of this was to say to him immediately, Peter, we're going to make this decision based on patient safety."

139.   Gilmartin, as a member of Merck's board, evidences the knowledge and direct control that Merck Directors exercised over Vioxx marketing. Merck Directors have repeatedly admitted to the Securities and Exchange Commission (SEC) that they exercised oversight and decision-making authority regarding strategic areas of importance, including "basic research and clinical development" and "global marketing and sales," as well as associated funding authorizations.

140.   Merck Director public statements in SEC filings further evidence their knowledge of Vioxx's clinical results. For example, in Merck's 2000 Report on Form 10-K filed with the SEC, then-serving Merck Directors Gilmartin, Bossidy, Bowen, Cole, Kelley, Miller, Tatlock and Thier stated, with relevant emphasis added here:

> In May 2000, Merck presented results from an 3,000 patient *Vioxx Gastrointestinal Outcomes He search (VIGOR) study* in which Vioxx reduced the incidence of serious gastrointestinal side effects, such as ulcers and bleeding, by more than 50% compared to the nor(steroidal anti-inflammatory drug Naproxen . . . .
> In February 2001 an FRDA arthritis Advisory Committee recommended that the gastrointestinal [VIGOR] study results, as well as data on *certain cardiovascular events* be included in the [Vioxx] labeling . . . .

*See also* Merck's 2001 Report on Form 10-K and 2002 Annual Report signed and/or approved by then-serving Merck Directors Bossidy, Bowden, Cole, Gilmartin, Henriques, Lewent, Miller, Shenck, Thier and/or Tatlock, and filed with the SEC.

141.   Similarly, in 2003, then-serving Merck Directors Bossiday, Bowen, Cole, Daley, Gilmartin, Harrison, Kelley, Miller, Shenk, Their, Weeks and/or Wendell stated that the earliest filed Vioxx personal injury and product liability civil actions alleging death and injury resulting front cardiovascular events caused by Vioxx lacked merit. These Merck Directors' ability to make this assertion necessarily rests upon their possessing sufficient knowledge to evaluate Vioxx's cardiovascular risks.

142.   It is additionally telling that Merck Directors included among their number Director Kelley who is a Professor of Medicine at the University of Pennsylvania School of Medicine, Director Thier who is a Professor of Medicine at Harvard University Medical

School, Director Schenk who is a Professor of Molecular Biology at Princeton University and Director Scolnick who served as Merck's Chief Scientist. Moreover, the FDA directed its September 17, 2001 warning letter personally to Director Gilmartin. Merck Directors accordingly possessed the knowledge and experience, in addition to the duty, to have analyzed Vioxx's cardiovascular risk when they oversaw and approved the drugs fraudulent marketing. Moreover, these Merck Directors personally benefited through increased salary, bonuses, fees and stock value resulting from the fraudulent marketing scheme they approved.

143. At the time of withdrawal. Defendants' fraudulent marketing scheme had induced over 2 million patients worldwide to take Vioxx. Over 100 million prescriptions had been dispensed in the United States alone Merck's Vioxx product had also caused American patients suffer as many as 88,000 to 140,000 heart attacks and strokes in addition to other serious medial complications. Dai, Carolanne, et al., *National Trends in Cyclooxygenase-2 Inhibitor Use Since Market Release, Archives of Internal Medicine,* 171-177 (Jan. 24, 2005*)*.

144. Contemporaneously with Merck's withdrawal of Vioxx from the worldwide market, on September 30, 2004, the FDA's Dr. Graham released a preliminary memorandum entitled "Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with Cox-2 Selective and Non Selective NSAIDS." Dr. Graham's memorandum reviewed three studies upon which Merck relied, two of which were funded by Merck itself, to downplay the cardiovascular risk identified in the VIGOR study by alleging a protective (Evality for Naproxen. Dr. Graham concluded that all three studies suffered from significant defects and that these "studies that reported a protective effect were misleading."

54

145.   Dr. Graham's analysis further projected that 27,785 heart attacks and sudden cardiac deaths "would have been avoided" had Merck's victims used Pfizer's product Celebrex rather than Vioxx.

146.   Following Merck's withdrawal of Vioxx, the corporation's stock price immediately plummeted 27%.   Mathews, Anna Wild and Martinez, Barbara *The Wall Street Journal, p* A 1, Nov. 1 2004.

147.   At all times relevant to this litigation, Merck's Vioxx-derived value and market share resulted from its fraudulent marketing scheme falsely asserting the drug's safety and efficacy.   Defendants, despite knowing Vioxx's cardiovascular risks, jointly and concertedly enacted this scheme by means of (1) materially misleading direct-to-consumer advertising that induced reasonable reliance in Plaintiffs and other consumers generally, (2) materially misleading sales representative marketing practices that induced reasonable physician reliance, denied physicians their traditional roles as learned intermediaries between drug manufacturers and patients, and derivatively reasonably induced Plaintiffs and other patients to believe false claims of safety and efficacy, (3) materially misleading both the general public and physicians by falsely asserting Vioxx safety and efficacy in press releases and publications and (4) otherwise fraudulently inducing physicians and consumer reliance in the manners discussed *supra*.

148.   Absent   Defendants'   material   misrepresentations   and   omissions, consumers -- including Plaintiffs herein -- would have either wholly refrained from using Vioxx and similar CO-2 pharmaceuticals or switched from Vioxx to safer pharmaceutical products such as Celebrex or traditional NSAIDs.

149.   Similarly, absent Defendants' material misrepresentations and omissions, physicians, including Plaintiffs' prescribing physicians, would have either wholly refrained from prescribing Vioxx or switched from Vioxx to safer pharmaceutical products.

150.   The harm suffered by Plaintiffs, and the derivative harm suffered by Derivative Plaintiffs, resulted directly and proximately from Defendants' joint and concerted fraudulent marketing scheme and the reasonable reliance induced by that fraud.

151.   Defendants' fraudulent concealment of Vioxx's cardiovascular risks, both before and after Defendants globally withdrew the drug, intentionally denied Pliantiffs vital knowledge and information regarding their claims without any fault or lack of diligence on their parts.   Accordingly, any relevant statute of limitations has been tolled to at least September 30, 2004, when Merck first publicly acknowledged some risks inherent to Vioxx in conjunction with its global withdrawal of this defective product.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST
### DEFENDANTS NAMED HEREIN, PLAINTIFFS ALLEGE:

152.   Plaintiffs and Derivative Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "151" of the Complaint herein with the same force and effect as fully set forth herein.

153.   Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the pharmaceutical drug, Vioxx, and in the course of same, directly advertised or marketed the product to the Food and Drug Administration, consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of Vioxx.

154.  At all relevant times, Defendants had a duty to exercise reasonable care and caution in the manufacture of the drug Vioxx for resale to the general public, so as not to injure any person who consumed the drug.

155.  At all relevant times, Defendants had a duty to adequately and properly test the drug Vioxx to ensure its safety for oral consumption.

156.  Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of Vioxx because no reasonable medical care provider would have prescribed, or no consumer would have used, Vioxx had those facts been made known to such providers and consumers.

157.  Defendants failed to perform and or otherwise failed to facilitate adequate testing which would have shown that Vioxx posed serious and potentially life-threatening side effects and complications.  Warnings accurately and fully reflecting the symptoms, scope and severity of these side effects and complaints should have been made to medical care providers including Plaintiffs' physician(s), the Food and Drug Administration and the public, including the Plaintiffs.

158.  Defendants knew or should have known of the risk of serious and potentially life-threatening side effects and complications from the use of Vioxx. Defendants recklessly and negligently produced, manufactured, promoted, advertised, sold and distributed the dangerous medication Vioxx as a safe COX-2 inhibitor, when in fact Vioxx is potentially harmful to human health in that it poses a greater likelihood of injury than other nonsteroidal antiinflammatory medicines and similar drugs on the market and is more dangerous than ordinary consumers could reasonably foresee.

159.  Vioxx, which was researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the

57

stream of commerce by Defendants, was defective due to inadequate post-marketing warnings and/or instruction because, after Defendants knew or should have known of the risk of serious and potentially life-threatening side effects and complications from the use Vioxx, Defendants failed to provided adequate warnings to medical care providers, the Food and Drug Administration and the consuming public, including Plaintiffs, and continued to promote Vioxx aggressively.

160.    Defendants' negligence consisted, among other things, of the following:

a.    failing to give proper and sufficient instruction to the medical profession, consumers and the general public in connection with the drug Vioxx.

b.    failing to give proper and adequate notice and warnings to medical care providers, the Food and Drug Administration and the consuming public, including Plaintiffs, of the dangers inherent in the use of the drug Vioxx;

c.    requesting physicians to prescribe Vioxx for their patients;

d.    failing to take the ordinary, proper and prudent precautions and safeguards to prevent injuries; and

e.    failing to timely remove the drug from the market after becoming aware that the drug Vioxx was dangerous and harmful to human health.

161.    As a proximate result of the Defendants' negligence in their failure to properly manufacture, test and label their products, and their willful and intentional failure to warn Plaintiffs, Plaintiffs' physicians, and other reasonably foreseeable users of the severe hazards associated with the use of Vioxx, the Plaintiffs sustained bodily injury.

162.    The Plaintiffs did not contribute in any manner to their own injuries.

163.    As a result of the foregoing, Plaintiffs have sustained bodily injury and suffered great pain and suffering, and have incurred and will continue to incur medical expenses and economic losses, in an amount exceeding $75,000.00.

164.   The intentional and willful conduct above complained of against the Defendants was aimed against the public as well as Plaintiffs, was grossly unjust and involved high moral culpability for which punitive damages should be assessed in a sum of money to be determined by the trier-of-fact. Plaintiffs presently withhold their plea for punitive damages subject to amendment pursuant to Minnesota Statutes § 549.191.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS NAMED HEREIN, PLAINTIFFS ALLEGE:

165.   Plaintiffs and Derivative Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "164" of the Complaint herein with the same force and effect as if fully set forth herein.

166.   Defendants willfully and intentionally refused to disclose known risks and hazards associated with the use of Vioxx, a product which they manufactured and/or placed into the stream of commerce.

167.   Vioxx was under the exclusive control of Defendants as aforesaid and was unaccompanied by appropriate warnings regarding all reasonably possible adverse side effects and complications associated with its use and the comparative severty, duration and extent of risk of surgery, said side effects and complications included, but were not limited to thrombotic events, dangerous drug-drug interactions and food-drug interactions.

168.   As a result of Defendants' failure to give adequate warnings of Vioxx's danger, or to give adequate instructions, Vioxx was manufactured and marketed in a defective condition to Plaintiffs and Plaintiffs' physicians as well as the general

public, was unreasonably dangerous to users such as the Plaintiffs, and proximately caused Plaintiffs' injuries and damages.

169.   Defendants are strictly liable to the Plaintiffs for designing, manufacturing, and placing into the stream of commerce a product which was defective due to inadequate warnings at the time it left Defendants' control.

170.   Plaintiffs used Vioxx for the purpose and in the manner normally .intended.

171.   Plaintiffs were unaware of and could not have, in the exercise of reasonable care, discovered the defects and hazardous nature of Vioxx, nor perceived the dangers thereof, nor otherwise averted their injuries and damages.

172.   By reason of the foregoing, Defendants are strictly liable to Plaintiffs in the amount and respects set forth in Plaintiffs' prayer for relief *infra.*

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS NAMED HEREIN, PLAINTIFFS ALLEGE:

173.   Plaintiffs and Derivative Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "172" of the Complaint herein with the same force and effect as if fully set forth herein.

174.   At all relevant times, Defendants had a duty to exercise reasonable care and caution in the manufacture of the drug Vioxx for resale to the general public, so as not to injure any person who consumed the drug.

175.   Vioxx is defective in its design or formulation in that it is not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation. Vioxx is defective in design or formulation in that it lacks efficacy and/or it poses a greater likelihood

of injury than other nonsteroidal anti-inflammatory medicines and similar drugs on the market and is more dangerous than ordinary consumers can reasonably foresee.

176.    The defective condition of Vioxx renders it unreasonably dangerous, and Vioxx was in this defective condition at the time it left Defendants' control.  Vioxx was expected to and did reach consumers, including Plaintiffs, without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce.

177.    Plaintiffs were unaware of and could not have, in the exercise of reasonable care, discovered the significant hazards and defects in Vioxx.  Vioxx was unreasonably dangerous in that it was more dangerous than would be reasonably contemplated by the ordinary user.

178.    During the period that Plaintiffs took Vioxx, the medication was prescribed and being utilized in a manner that was intended by Defendants.  At the time Plaintiffs received and consumed Vioxx, it was represented to be safe and free from latent defects.

179.    Defendants knew or should have known of the danger associated with use of Vioxx, as well as the defective nature of Vioxx, but continued to design, manufacture, sell distribute, market, promote and/or supply Vioxx so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by Vioxx.

180.    As a proximate result of Defendants' negligence in designing, manufacturing, selling, distributing, marketing and promoting a defective product, Vioxx, Plaintiffs sustained bodily injuries.

181.   By reason of the foregoing, Defendants are strictly liable to Plaintiffs in the amount and respects set forth in Plaintiffs' prayer for relief *infra*.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS NAMED HEREIN, PLAINTIFFS ALLEGE:

182.   Plaintiffs and Derivative Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "181" of the Complaint herein with the same force and effect as if fully set forth herein.

183.   Defendants willfully and intentionally concealed and/or refused to disclose known defects and hazards associated with the use of the pharmaceutical drug Vioxx which they manufactured and/or placed into the stream of commerce.

184.   Plaintiffs were unaware of the significant hazards and defects in Vioxx.

185.   Plaintiffs used Vioxx for the purpose and in the manner normally intended.

186.   As a result of Defendants' failure, among other things, to test Vioxx for hazards, or to give adequate warning of its hazards danger, Vioxx was manufactured and marketed in a defective condition, was unreasonably dangerous to users such as Plaintiffs, and proximately caused Plaintiffs' injuries and damages.

187.   Plaintiffs could not have, in the exercise of reasonable care, discovered the defects and hazardous nature of the products manufactured and marketed by the Defendants, nor perceived the dangers thereof, nor otherwise averted their injuries and damages.

188.   Defendants' actions in concealing the true nature of Vioxx's cardiovascular risks contributed to Plaintiffs' inability to perceive the defects and dangerous nature of the drug.

189. Defendants are strictly liable to the Plaintiffs for designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of Defendants because of the design defects.

190. Defendants knew or should have known of the danger associated with the use of Vioxx, as well as the defective nature of Vioxx, but continued to design, manufacture, sell, distribute, market, promote and/or supply Vioxx so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by Vioxx.

191. By reason of the foregoing, Defendants are strictly liable to Plaintiffs in the amount and respects set forth in Plaintiffs' prayer for relief *infra*.

### AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS NAMED HEREIN, PLAINTIFFS ALLEGE:

192. Plaintiffs and Derivative Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "191" of the Complaint herein with the same force and effect as if fully set forth herein.

193. Upon information and belief, at all times relevant, the Defendants, their agents, servants and employees manufactured and distributed for resale to the general public the pharmaceutical drug Vioxx for oral consumption. The drug was manufactured and sold by the Defendants for medicinal purposes, in particular for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

194. Upon information and belief, in connection with the research, manufacture, production and distribution and sale of the drug Vioxx, the Defendants studied its properties and became familiar with them.

195. Upon information and belief, at all relevant times, Defendants knew or should have known that the drug Vioxx has dangerous and had harmful effects when used by human beings.

196. Upon information and belief, Defendants, in order to promote the use of the drug and to introduce a greater market for Vioxx, expressly warranted to physicians, and to Plaintiffs' prescribing physicians, that patients such as the Plaintiffs could use Vioxx for the purpose intended with complete safety.

197. Upon information and belief, prior to the time Plaintiffs purchased and/or accepted samples of Vioxx, Defendants in order to promote the use of the drug and to induce purchase of Vioxx, expressly warranted to the general public and to Plaintiffs, by advertisement, circulars, literature and otherwise, that the consumers, including Plaintiffs, could use Vioxx for internal oral consumption for the purpose intended with complete safety.

198. The Plaintiffs relied on Defendants skill, judgment and warranty in purchasing and consuming Vioxx, and Plaintiffs' doctors relied on the Defendants' skill, judgment and warranty in prescribing for Plaintiffs.

199. When Plaintiffs were prescribed and/or purchased and/or accepted samples from their physicians of Vioxx and when Defendants sold, gave and distributed Vioxx for resale, Defendants' warranties regarding the drug were not true.

200. The drug Vioxx was not safe and effective as a medication, as Defendants had represented.

201.   Defendants' breach of express warranties proximately caused Plaintiffs' injuries and damages.

202.   By reason of the foregoing, Defendants are strictly liable to Plaintiffs in the amount and respects set forth in Plaintiffs' prayer for relief *infra*.

### AS AND FOR A SIXTH CAUSE OF ACTION AGAINST
### DEFENDANTS HERE, PLAINTIFFS ALLEGE:

203.   Plaintiffs and Derivative Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "202" of the Complaint herein with the same force and effect as if fully set forth herein.

204.   At all times relevant to the events described in this Complaint, Defendants knew or should have known of the hazards associated with the use of the pharmaceutical drug, Vioxx.

205.   Upon information and belief, Defendants willfully, recklessly and intentionally concealed and/or misrepresented facts regarding the dangers associated with the use of Vioxx.

206.   Prior to the Plaintiffs' ingestion of Vioxx, Defendants falsely represented to the public, including Plaintiffs and Plaintiffs' physicians, through direct promotional campaigns, advertisements, literature to physicians and the literature enclosed in the container in which the drug was sold, that the drug Vioxx and the dosages prescribed were safe and suitable for the purpose intended and could be used with safety to health and well being.

207.   Defendants intentionally falsely stated, advertised or otherwise represented to the Plaintiffs, to other users of Vioxx, to the health care professionals and

to the public that, as a matter of fact, that it was completely safe to use Vioxx at the recommended dosage levels.

208.    In contradiction to known data, or in reckless indifference to its existence, Merck intentionally misrepresented, advertised or otherwise knowingly and intentionally created the false impression in the Plaintiffs, other persons using Vioxx, the health care community including Plaintiffs' physicians and among the public that Vioxx was completely safe as long as it was used as intended.

209.    Upon information and belief, Defendants knew such statements, representations and advertisements to be false, misleading or incomplete at the time they were made or made them with reckless indifference as to whether they were true or complete at the time they were made.

210.    Upon information and belief, other acts of intentional concealment and suppression of material facts as to the dangerousness of Vioxx were performed by Defendants, the details of which lie within knowledge still peculiar to the Defendants.

211.    Acting out of pecuniary motives, Defendants ignored and intentionally did not act upon pertinent medical and scientific data issued by the Department of Health and Human Services, corporate medical advisors, and other governmental and private agencies, thereby causing Plaintiffs to be exposed to hazards associated with the use of Vioxx.

212.    Upon information and belief, Defendants knew that if the suppressed and concealed material facts were known to users and those contemplating use of Vioxx, they would choose not to use Vioxx, thereby lowering production rates and limiting Vioxx's profitable sale.

213.   Upon information and belief, Defendants knew that if the suppressed and concealed facts were known to the medical community, they would choose not to prescribe Vioxx thereby lowering production rates and limiting Vioxx's profitable sale.

214.   Upon information and belief, Defendants did not have a good faith belief that the concealed scientific and medical information was immaterial or insignificant to the Plaintiffs' understanding of the gravity of harm associated with the use of Vioxx.

215.   Upon information and belief, Defendants did not have a good faith belief that the concealed scientific and medical information was erroneous, inaccurate, or otherwise unworthy of dissemination to the general public, the medical community or to the Plaintiffs and Plaintiffs' physicians.

216.   Defendants' representations were false and fraudulent and were made with the intent to deceive the public, including the Plaintiffs, and Plaintiffs' physicians, to rely on those representations in the purchase and use of the drug Vioxx.

217.   The defendant's representations were false in that:

(a)   the representations failed to warn doctors and potential users of the drug Vioxx of possible injuries, disabilities, harmful adverse reactions and deleterious after and side effects of the drug, and of the necessity of following patients closely;

(b)   the promotional campaigns, advertisements, and literature were incomplete in many respects in that the defendant knew or should have known of the dangerous propensities of the drug;

(c)   the defendant concealed its knowledge of the dangerous propensities of the drug in its advertisements, literature and communications to the medical profession.

218.   Defendants made such representations with the purpose and intent of having potential users of the drug rely on the representations. Plaintiffs relied on the Defendants' representations in purchasing and consuming Vioxx, and, upon information and belief,

67

Plaintiffs' physicians relied on the Defendants' representations in prescribing Vioxx for Plaintiffs.

219.   Plaintiffs and the public were otherwise unaware of the facts intentionally undisclosed and willfully concealed by Defendants and could not have become aware of the facts through the exercise of reasonable diligence.

220.   Defendants' conduct constitutes violations of the consumer fraud protection acts including the Consumer Fraud Act, The False Statement in Advertisement Statute, the Uniform Deceptive Trade Practices Act and the Unlawful Trade Practices Act as codified in Minnesota Statutes sections 325D.13, 325D.44, 325F.67 and 325F.68-70 by inducing Plaintiffs to purchase and use Vioxx through the use of false and/or misleading advertising, representation and statements and, through these practices, injuring Plaintiffs.

221.   Plaintiffs and their physicians justifiably relied upon Defendants' superior knowledge of and familiarity with Vioxx, and such reliance was known by or should have been known by Defendants.   Plaintiffs justifiably relied upon Defendants' deceptive and false advertising resulting in their injuries.

222.   As a direct result of Defendants' willful and wanton acts and omissions, gross negligence, conscious indifference and utter disregard for Plaintiffs' life, health, safety, and welfare, Plaintiffs were caused to sustain other personal injuries, have undergone and in the future will undergo great pain and suffering, were and are unable to attend to their usual occupation and activities, were and in the future will be required to spend money for medical care and have sustained and will sustain other losses, all to their damage in a sum exceeding $75,000.00

### AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS NAMED HEREIN, PLAINTIFFS ALLEGE:

223.   Plaintiffs and Derivative Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "222" of the Complaint herein with the same force and effect as if fully set forth herein.

224.   Defendants accepted payment from Plaintiffs for the purchase of Vioxx as a safe and effective drug.  Plaintiffs did not receive a safe and effective drug for which they paid.  Defendants have accordingly been unjustly enriched by Plaintiffs and must make restitution of all purchase costs, disgorge all profits and tender all other such relief as provided by law.

## AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS NAMED HEREIN, PLAINTIFFS ALLEGE:

225.   Plaintiffs and Derivative Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "224" of the Complaint herein with the same force and effect as if fully set forth herein.

226.   At all times hereinafter mentioned, Plaintiffs JAMES AUSTIN, MERLE E. BARNES, RONALD BARNHART, RONELL B. BE'ANS, HOWARD BELLINGER, KENNETH S. BIALYNSKI, ROBERT BOAST, FREDDIE BOYD, PHILIP BRADNEY, CHARLES BRANNAN, GEORGE R. BREAN, DAVID BROOKS, JACK BUDREAU, NORMAN L. CAMPBELL, DAVID CASE, LYNN CASE, ALEXANDER CHERKIS, JOHN COOPER, ROBERT CRITES, FREDERICK CROGAN, JERRY CUMMINGS, ROBERT CURTIN, WALTER DAYTON, DANIEL R. DODGE, HAROLD E. DODSON, DONALD DOWELL, LEE DURANT, JAMES FACTEAU, RON FISHER, JAMES L. FITCH, MARTIN FRENCH, ROBERT FRENCH, ROBERT GALIDA, DAVID H. GATGENS, MICHAEL GEARY, ARNIE R. GESLIN, ALBERT GIBEAULT, DONALD GOBLE, HARMON RAY GOLDBERG, KENT GREENFIELD, WILLIE J. GRIGGS,  ROBERT GUGLIZZA, CHAKRADHAR GUHA, BILL

69

HANSEN, WILLIAM HARDY,  MICHAEL HATEM, CHARLES L. HEBNER, LYLE HICKS,
WILLIE  HOLMES,  SR.,    BENNIE  HOUSTON,    JOHN  HOWES,    JERRY  HUNT,
SALVATORE INGLIMA,  SEMEN IZRAILOV,  FRANK JENKINS, JR.,  HAROLD JEWETT,
BRUCE JOHNSON, RAY D. JOHNSON,  ROBERT W. JONES,  ROY L. JONES, WILLIAM
KEENAN, BERNARD KREITZBERG,  WILLIAM P. LANCER, GARY LATIES, JOSEPH
LECZEL, DENNIS LITZINGER, LUCIAN C. LODESTRO,  JOSEPH MARSALA,  RONALD
MARSHALL,  FRANCISCO MARTINEZ,  PATRICK MILLIGAN, CHARLES T. MOORE, SR.,
ALFRED MOSACK, EARL M. MOSHER, JOHN NEWMAN, CHARLES NICASTRO, GUY
NORMAN, PATRICK O'DONNELL,  MAYNARD OLIN,  STEPHEN OPETT, EFRAIN G.
ORTIZ,  LAWRENCE E. PARKHURST,  MARSHALL PATRICK, DRAGUTIN PAVLOVIC,
RICHARD PICKARD, SAMUEL K. QUARTEY, JACK QUINN, DONALD RASMUSSEN,
TOM REYNOLDS, RONALD RIPPETH, IQBAL RIZVI, ROBERT J. ROBEY, JOHN W.
ROCHFORD, ROBERT ROSAMINO, SHERWOOD A. RUSSELL, NORMAN W. SAVAGE,
LOUIS SCHIMENTI, SALVATORE SCIORTINO, JULIUS SCURRY, DEAN L. SIMPSON,
JAMES SMITH,  MARVIN SMITH, JOHN R. SOLTIS, ROCCO STAGNITTO, ROBERT
STEWART,  ROBERT STOWELL, RUSSELL F. TACK, ROSCOE H. TAYLOR, WILLIAM L
TAYLOR,  ANDRE TELEMARQUE, EDWIN E. TELLIER, JOSEPH V. THOMAS, SAMUEL
H. TUBAUGH, JR., BRUCE UNSON,  DAN WAGNER, HENRY D. WHITE, ARDEN
WILSON,  RICHARD WOLFGANG, JAMES H. WRIGHT, JR., FRANK D. WRIGHTMAN,
STEPHEN ZWEIG, are the respective spouses of Derivative PlaintiffsSUZANNE AUSTIN,
JEANNETTE M. BARNES, BONNIE BARNHART, WANDA E. BELLINGER, ROSEMARIE
BIALYNSKI, PATRICIA BRADNEY, CLAIRE BRANNAN, JULIE BREAN, BETTY BROOKS,
BARBARA A. BUDREAU, ELAINE CASE, SALLY CASE, JANET CRITES, ANNA DAYTON,
MARY DODGE, VERONICA DOWELL, MARLENE DURANT, MARY F. FISHER, MARY

FITCH, MARGARET FRENCH, JANICE GATGENS, SUZANNE GESLIN, SARINA GIBEAULT, EMILY GOBLE, CONNIE L. GREENFIELD, JAYARSEE GUHA, PATTIE HATEM, MARGARET HOLMES, GAIL HOWES, CHARLOTTE HUNT, MARIA INGLIMA, LINDA JEWETT, SHARON JOHNSON, JUDITH E. JOHNSON, CHARLOTTE JONES, TERESE KREITZBERG, MARGARET C. LANCER, JODY LATIES,JOANNE LITZINGER, LAURENE LODESTRO, ANNA MARSALA, ISABEL MARTINEZ, GAIL MILLIGAN, EUGENIA P MOORE, FRANCES A. MOSHER, VIRGINIANEWMAN, APRIL NICASTRO, BONNIE J. NORMAN, SHARON O'DONNELL,DEBORAH A. OLIN, RITA M. OPETT, CYNTHIA SZACH, BEVERLY J. PARKHURST, MILLICENT PATRICK, BOSA PAVLOVIC, CATHERINE QUINN, DEANN RASMUSSEN, LOU ANN RIPPETH, SIRAJ A. RIZVI, SANDRA K. RUSSELL, PATRICIA A. SAVAGE, BETTY J. SMITH, SIVI SMITH, GLORIA M. SOLTIS, CLAIRE STEWART, JUNE TACK, JOY K. TAYLOR, MARIE M. TELEMARQUE, TERESA A. THOMAS, SHARON D. WHITE, CAROL WILSON, JOSEPHINE M. WRIGHT, and each was entitled to their respective spouse's services, society, companionship and consortium.

227. As a result of the aforesaid incidents, Derivative Plaintiffs were deprived of the services, society, companionship and consortium of their respective spouses, and continue to be, all to their damage in an amount exceeding $75,000.00.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and Derivative Plaintiffs demand judgment against Defendants as follows:

    a.    On the First Cause of Action in an amount to be proven at trial including compensatory damages;

    b.    On the Second Cause of Action in an amount to be proven at trial including compensatory damages;

71

c.     On the Third Cause of Action in an amount to be proven at trial including compensatory damages;

d.     On the Fourth Cause of Action in an amount to be proven at trial including compensatory damages;

e.     On the Fifth Cause of Action in an amount to be proven at trial including compensatory damages;

f.     On the Sixth Cause of Action in an amount to be proven at trial including compensatory damages;

g.     On the Seventh Cause of Action in an amount to be proven at trial including compensatory damages;

h.     On the Eighth Cause of Action in an amount to be proven at trial including compensatory damages;

i.     The attorney's fees, costs and disbursements of this action and legal interest on all damages from date of demand until paid, and such other and further relief as the Court deems just, equitable and proper.

### JURY TRIAL DEMAND

Plaintiffs and Derivative Plaintiffs respectfully demand trial by jury on

all issues presented.

DATED:     Buffalo, New York
            December 21, 2005

**TREPANIER & MACGILLIS P.A.**

By: _____

Craig W. Trepanier     James C. MacGillis
Attorney Reg. No. 250776 Attorney Reg. No. 283812
Direct Dial: 612-455-0502 Direct Dial: 612-455-0503
craig@trepanierlaw.com
jmacgillis@trepanierlaw.com

72

Trepanier & MacGillis P.A.
8000 Flour Exchange Building
310 Fourth Avenue South
Minneapolis, Minnesota  55415
Telephone:  612-455-0500
Facsimile:   612-455-0501
www.trepanierlaw.com


**THE BARNES FIRM, P.C.**

By:_____

Brian A. Goldstein, Esq.
Attorney New York Reg. No. 2715019
Direct Dial: 716-566-2269
brian.goldstein@thebarnesfirm.com

The Barnes Firm, P.C.
17 Court Street, 7th Floor
Buffalo, New York 14202-3290
Telephone: 716-854-2020
Facsimile: 716-854-6291

**ATTORNEYS FOR PLAINTIFFS**

73



STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

JAMES AUSTIN and SUZANNE AUSTIN,
Individually and as Husband and Wife, MERLE
E. BARNES and JEANNETTE M. BARNES,
Individually and as Husband and Wife,
RONALD BARNHART and BONNIE
BARNHART, Individually and as Husband and
Wife, RONELL B. BE'ANS, Individually,
HOWARD BELLINGER and WANDA E.
BELLINGER, Individually and as Husband and
Wife, KENNETH S. BIALYNSKI and
ROSEMARIE BIALYNSKI, Individually and as
Husband and Wife, ROBERT BOAST,
Individually, FREDDIE BOYD, Individually,
PHILIP BRADNEY and PATRICIA BRADNEY,
Individually and as Husband and Wife,
CHARLES BRANNAN and CLAIRE BRANNAN,
Individually and as Husband and Wife,
GEORGE R. BREAN and JULIE BREAN,
Individually and as Husband and Wife  DAVID
BROOKS and BETTY BROOKS, Individually
and as Husband and Wife, JACK BUDREAU
and BARBARA A. BUDREAU, Individually and
as Husband and Wife, NORMAN L.
CAMPBELL, Individually, DAVID CASE and
ELAINE CASE, Individually and as Husband
and Wife, LYNN CASE and SALLY CASE,
Individually and as Husband and Wife,
ALEXANDER CHERKIS, Individually, JOHN
COOPER, Individually, ROBERT CRITES and
JANET CRITES, Individually and as Husband
and Wife, FREDERICK CROGAN, Individually,
JERRY CUMMINGS, Individually,  ROBERT
CURTIN, Individually, WALTER DAYTON and
ANNA DAYTON, Individually and as Husband
and Wife, DANIEL R. DODGE and MARY
DODGE, Individually and as Husband and
Wife, HAROLD E. DODSON, Individually,
DONALD DOWELL and VERONICA DOWELL,
Individually and as Husband and Wife, LEE
DURANT and MARLENE DURANT, Individually
and as Husband and Wife, JAMES FACTEAU,
Individually, RON FISHER and MARY F.

Case Type: Personal Injury

Court File No. 27CV061250

FISHER, Individually and as Husband and
Wife, JAMES L. FITCH and MARY FITCH,
Individually and as Husband and Wife,
MARTIN FRENCH, Individually, ROBERT
FRENCH and MARGARET FRENCH,
Individually and as Husband and Wife,
ROBERT GALIDA, Individually, DAVID H.
GATGENS and JANICE GATGENS,
Individually and as Husband and Wife,
MICHAEL GEARY, Individually, ARNIE R.
GESLIN and SUZANNE GESLIN, Individually
and as Husband and Wife, ALBERT GIBEAULT
and SARINA GIBEAULT, Individually and as
Husband and Wife, DONALD GOBLE and
EMILY GOBLE, Individually and as Husband
and Wife, HARMON RAY GOLDBERG,
Individually, KENT WILLIE J. GRIGGS,
Individually, ROBERT GUGLIZZA, Individually,
CHAKRADHAR GUHA and JAYARSEE GUHA,
Individually and as Husband and Wife, BILL
HANSEN, Individually, WILLIAM HARDY,
Individually, MICHAEL HATEM and PATTIE
HATEM, Individually and as Husband and Wife,
CHARLES L. HEBNER, Individually, LYLE
HICKS, Individually, WILLIE HOLMES, SR. and
MARGARET HOLMES, Individually and as
Husband and Wife, BENNIE HOUSTON,
Individually, JOHN HOWES and GAIL HOWES,
Individually and as Husband and Wife, JERRY
HUNT and CHARLOTTE HUNT, Individually
and as Husband and Wife, SALVATORE
INGLIMA and MARIA INGLIMA, Individually
and as Husband and Wife, SEMEN IZRAILOV,
Individually, FRANK JENKINS, Individually,
HAROLD JEWETT and LINDA JEWETT,
Individually and as Husband and Wife, BRUCE
JOHNSON and SHARON JOHNSON,
Individually and as Husband and Wife, RAY D.
JOHNSON and JUDITH E. JOHNSON,
Individually and as Husband and Wife,
ROBERT W. JONES and CHARLOTTE
JONES, Individually and as Husband and Wife,
ROY L. JONES, Individually, WILLIAM
KEENAN, Individually, BERNARD
KREITZBERG and TERESE KREITZBERG,
Individually and as Husband and Wife,
WILLIAM P. LANCER and MARGARET C.

2

LANCER, Individually and as Husband and
Wife, GARY LATIES and JODY LATIES,
Individually and as Husband and Wife,
JOSEPH GREENFIELD and CONIE L.
GREENFIELD, Individually and as Husband
and Wife, LECZEL, Individually, DENNIS
LITZINGER and JOANNE LITZINGER,
Individually and as Husband and Wife,
LUCIAN C. LODESTRO and LAURENE
LODESTRO, Individually and as Husband and
Wife, JOSEPH MARSALA and ANNA
MARSALA, Individually and as Husband and
Wife, RONALD MARSHALL, Individually,
FRANCISCO MARTINEZ and ISABEL
MARTINEZ, Individually and as Husband and
Wife, PATRICK MILLIGAN and GAIL
MILLIGAN, Individually and as Husband and
Wife, CHARLES T. MOORE and EUGENIA P.
MOORE, Individually and as Husband and
Wife, ALFRED MOSACK, Individually, EARL M.
MOSHER and FRANCES A. MOSHER,
Individually and as Husband and Wife, JOHN
NEWMAN and VIRGINIA NEWMAN,
Individually and as Husband and Wife,
CHARLES NICASTRO and APRIL NICASTRO,
Individually and as Husband and Wife, GUY
NORMAN and BONNIE J. NORMAN,
Individually and as Husband and Wife,
PATRICK O'DONNELL and SHARON
O'DONNELL, Individually and as Husband and
Wife, MAYNARD OLIN and DEBORAH A.
OLIN, Individually and as Husband and Wife,
STEPHEN OPETT and RITA M. OPETT,
Individually and as Husband and Wife,
EFRAIN G. ORTIZ and CYNTHIA SZACH,
Individually and as Husband and Wife,
LAWRENCE E. PARKHURST and BEVERLY
J. PARKHURST, Individually and as Husband
and Wife, MARSHALL PATRICK and
MILLICENT PATRICK, Individually and as
Husband and Wife, DRAGUTIN PAVLOVIC
and BOSA PAVLOVIC, Individually and as
Husband and Wife, RICHARD PICKARD,
Individually, SAMUEL K. QUARTEY,
Individually, JACK QUINN and CATHERINE
QUINN, Individually and as Husband and Wife,
DONALD RASMUSSEN and DEANN

3

RASMUSSEN, Individually and as Husband
and Wife, TOM REYNOLDS, Individually,
RONALD RIPPETH and LOU ANN RIPPETH,
Individually and as Husband and Wife, IQBAL
RIZVI and SIRAJ A. RIZVI, Individually and as
Husband and Wife, ROBERT J. ROBEY,
Individually, JOHN W. ROCHFORD,
Individually, ROBERT ROSAMINO, Individually,
SHERWOOD A. RUSSELL and SANDRA K.
RUSSELL, Individually and as Husband and
Wife, NORMAN W. SAVAGE and PATRICIA
SAVAGE, Individually and as Husband and
Wife, LOUIS SCHIMENTI, Individually,
SALVATORE SCIORTINO, Individually,
JULIUS SCURRY, Individually, DEAN L.
SIMPSON, Individually, JAMES SMITH and
BETTY J. SMITH, Individually and as Husband
and Wife, MARVIN SMITH and SIVI SMITH,
Individually and as Husband and Wife, JOHN
R. SOLTIS and GLORIA M. SOLTIS,
Individually and as Husband and Wife,
ROCCO STAGNITTO, Individually, ROBERT
STEWART and CLAIRE STEWART,
Individually and as Husband and Wife,
ROBERT STOWELL, Individually, RUSSELL F.
TACK and JUNE TACK, Individually and as
Husband and Wife, ROSCOE H. TAYLOR,
Individually, WILLIAM L. TAYLOR and JOY K.
TAYLOR, Individually and as Husband and
Wife, ANDRE TELEMARQUE and MARIE M.
TELEMARQUE, Individually and as Husband
and Wife, EDWIN E. TELLIER, Individually,
JOSEPH V. THOMAS and TERESA A.
THOMAS, Individually and as Husband and
Wife, SAMUEL H. TUBAUGH, JR.,
Individually, BRUCE UNSON, Individually,
DAN WAGNER, Individually, HENRY D.
WHITE and SHARON D. WHITE, Individually
and as Husband and Wife, ARDEN WILSON
and CAROL WILSON, Individually and as
Husband and Wife, RICHARD WOLFGANG,
Individually, JAMES H. WRIGHT and
JOSEPHINE M. WRIGHT, Individually and as
Husband and Wife, FRANK D. WRIGHTMAN,
Individually, STEPHEN ZWEIG, Individually,

4

Plaintiffs,

v.

MERCK & CO., INC., MERCK FROSST
CANADA, LTD.  and DOES 1 – 100,

Defendants.

---

## CERTIFICATE OF REPRESENTATION AND PARTIES

---

PLAINTIFFS:

Name and Address of Party:

JAMES AUSTIN and SUZANNE AUSTIN,
Individually and as Husband and Wife,
21012 Delano Way
Fairabault, MN  55021

MERLE E. BARNES and
JEANNETTE M. BARNES,
Individually and as Husband and Wife,
Box 256
Natural Bridge, NY  13665

RONALD BARNHART and BONNIE BARNHART,
Individually and as Husband and Wife,
6960 Duffy Road
Delaware, OH  43015

RONELL B. BE'ANS, Individually,
39 Delamaine Dr.
Rochester, NY  14621

HOWARD BELLINGER and
WANDA E. BELLINGER,
Individually and as Husband and Wife,
1700 Hickory Hill Road
Fonda, NY  12068

KENNETH S. BIALYNSKI and
ROSEMARIE BIALYNSKI,
Individually and as Husband and Wife,
5528 Tripp Road
Marion, NY  14505

DEFENDANTS:

Name and Address of Party:

MERCK & CO., INC.
One Merck Drive
White House Station, NJ 08889

MERCK FROSST CANADA, LTD
16711 Trans Canada Highway
Kirkland, Quebec  H9H3L1

DOES 1-100
c/o MERCK & CO., INC.
One Merck Drive
White House Station, NJ  08889

ROBERT BOAST, Individually,
15 North Main Street, Apt #11A
Dunkirk, NY  14048

FREDDIE BOYD, Individually,
34 Meria Street
Rochester, NY  14605

PHILIP BRADNEY and PATRICIA BRADNEY,
Individually and as Husband and Wife,
123 Weston Lane
Painted Post, NY  14870

CHARLES BRANNAN and CLAIRE BRANNAN,
Individually and as Husband and Wife,
22129 McAdow Road
Marysville, OH  43040

GEORGE R. BREAN and JULIE BREAN,
Individually and as Husband and Wife
6208 North Oval Drive
Clinton, OH  44216

DAVID BROOKS and BETTY BROOKS,
Individually and as Husband and Wife,
338 Linda Lane
Montgomery, AL  36108

JACK BUDREAU and BARBARA A. BUDREAU,
Individually and as Husband and Wife,
18 Spikerush Court
Pataskala, OH  43062

NORMAN L. CAMPBELL, Individually,
3015 Marion Melmore Road
Nevada, OH  44849

DAVID CASE and ELAINE CASE,
Individually and as Husband and Wife,
29 Four Wheel Drive
Warren, PA  16365

LYNN CASE and SALLY CASE,
Individually and as Husband and Wife,
P.O. Box 212
Limestone, NY  14753

6

ALEXANDER CHERKIS, Individually,
448 Neptune Ave. apt 14m
Brooklyn, NY  11224

JOHN COOPER, Individually,
313 Belmore Drive
North Syracuse, NY  13212

ROBERT CRITES and JANET CRITES,
Individually and as Husband and Wife,
504 Palmer
Wooster, OH  44691

FREDERICK CROGAN, Individually,
3068 Shenk Road, Apt. #104
Sanborn, NY  14132

JERRY CUMMINGS, Individually,
P.O. Box 165
Delaware, OH  43015

ROBERT CURTIN, Individually,
680 Central Avenue
Albany, NY  12206

WALTER DAYTON and ANNA DAYTON,
Individually and as Husband and Wife,
230 Montrose Drive
Conklin, NY  13708

DANIEL R. DODGE and MARY DODGE,
Individually and as Husband and Wife,
45 Caroway
Spencerport, NY  14559

HAROLD E. DODSON, Individually,
117 Harris Street
Lodi, OH  44254

DONALD DOWELL and VERONICA DOWELL,
Individually and as Husband and Wife,
27 Oxbow Road
Oswego, NY  13126

LEE DURANT and MARLENE DURANT,
Individually and as Husband and Wife,
2637 State Route #12B
Deansboro, NY  13328

JAMES FACTEAU, Individually,
18 Fourth Avenue, Apt 106
Renselear, NY  12144

RON FISHER and MARY F. FISHER,
Individually and as Husband and Wife,
5827 Parkhill Drive
Parma Heights, OH  44130

JAMES L. FITCH and MARY FITCH,
Individually and as Husband and Wife,
117 Summit Street
Batavia, NY  14020

MARTIN FRENCH, Individually,
P.O. Box 162
Oakfield, NY  14125

ROBERT FRENCH and MARGARET FRENCH,
Individually and as Husband and Wife,
54 Bright Oaks Drive
Rochester, NY  14624

ROBERT GALIDA, Individually,
14-165 Limeridge Road West
Hamilton, Ontario
CANADA,   L9C 2V4

DAVID H. GATGENS and JANICE GATGENS,
Individually and as Husband and Wife,
3381 Fratt Road
Batavia, NY  14020

MICHAEL GEARY, Individually,
P.O. Box 126
Waterloo, NY  13165

ARNIE R. GESLIN and SUZANNE GESLIN,
Individually and as Husband and Wife,
37230 Pottery Trail
Taylors Falls, MN  55084

8

ALBERT GIBEAULT and SARINA GIBEAULT,
Individually and as Husband and Wife,
1219 Hinchey Road
Gates, NY 14624

DONALD GOBLE and EMILY GOBLE,
Individually and as Husband and Wife,
58 Kaydeross Avenue West
Saratoga Springs, NY 12866

HARMON RAY GOLDBERG, Individually,
553 66th Avenue NE
Fridley, MN 55432-4404

KENT GREENFIELD and CONIE L. GREENFIELD,
Individually and as Husband and Wife,
3434 Main Street
Branchport, NY 14418

WILLIE J. GRIGGS, Individually,
7807 Cedar Avenue #3
Cleveland, OH 44103

ROBERT GUGLIZZA, Individually,
543 Hague Street
Rochester, NY 14606

CHAKRADHAR GUHA and JAYARSEE GUHA,
Individually and as Husband and Wife,
230 Princeton Avenue
Staten Island, NY 10306

BILL HANSEN, Individually,
97 Park Drive
Dover Plains, NY 12522

WILLIAM HARDY, Individually,
111 Fairfield Drive
N. Syracuse, NY 13212

MICHAEL HATEM and PATTIE HATEM,
Individually and as Husband and Wife,
10515 Rodge Road
Amanda, OH 43102

9

CHARLES L. HEBNER, Individually,
P.O. Box 4
Stockton, NY  14784

LYLE HICKS, Individually,
427 Broadway
Elmira, NY  14904

WILLIE HOLMES, SR. and MARGARET HOLMES,
Individually and as Husband and Wife,
233 West High Terrace
Rochester, NY  14619

BENNIE HOUSTON, Individually,
2896 East 112th Street
Cleveland, OH  44104

JOHN HOWES and GAIL HOWES,
Individually and as Husband and Wife,
P. O. Box 237
Spencertown, NY  12165

JERRY HUNT and CHARLOTTE HUNT,
Individually and as Husband and Wife,
230 2nd Avenue, N.W.
Milaca, MN  56353

SALVATORE INGLIMA and MARIA INGLIMA,
Individually and as Husband and Wife,
63 Bru-mar Drive
Rochester, NY  14606

SEMEN IZRAILOV, Individually,
8804 63rd Drive, Apt. 521
Rego Park, NY  11374

FRANK JENKINS, Individually,
11218 Continental
Cleveland, OH  44104

HAROLD JEWETT and LINDA JEWETT,
Individually and as Husband and Wife,
70 West Third Street
Oswego, NY  13126

BRUCE JOHNSON and SHARON JOHNSON,
Individually and as Husband and Wife,
47 Linden Street
Livonia, NY  14487

RAY D. JOHNSON and JUDITH E. JOHNSON,
Individually and as Husband and Wife,
8700 Lilly Chapel Georgiasville Road
W. Jefferson, OH  43162

ROBERT W. JONES and CHARLOTTE JONES,
Individually and as Husband and Wife,
7759 Asher Drive
Holland Patent, NY  13354

ROY L. JONES, Individually,
62 Evergreen Drive
Rochester, NY  14624

WILLIAM KEENAN, Individually,
691 Garden Avenue
Olean, NY  14760

BERNARD KREITZBERG and
TERESE KREITZBERG,
Individually and as Husband and Wife,
261 Collingwood Drive
Rochester, NY  14621

WILLIAM P. LANCER and MARGARET C. LANCER,
Individually and as Husband and Wife,
211 Sheppler Street
Rochester, NY  14612

GARY LATIES and JODY LATIES,
Individually and as Husband and Wife,
106 Em Street
Shinglehouse, PA  16748

JOSEPH LECZEL, Individually,
7102 East Evans Creek Road
Rogue River, OR  97537

DENNIS LITZINGER and JOANNE LITZINGER,
Individually and as Husband and Wife,
704 Beach Road
Angola, NY  14006

11

LUCIAN C. LODESTRO and LAURENE LODESTRO
Individually and as Husband and Wife,
11 Anderson Avenue
Falconer, NY  14733

JOSEPH MARSALA and ANNA MARSALA,
Individually and as Husband and Wife,
6218 Carlyle Street
Seven Hill, OH  44131

RONALD MARSHALL, Individually,
1133 Dicks Road
Hudson Falls, NY  12839

FRANCISCO  MARTINEZ  and  ISABEL  MARTINEZ,
Individually and as Husband and Wife,
1900 Lexington Avenue, Apt. 6A
New York, NY  10035

PATRICK MILLIGAN and GAIL MILLIGAN,
Individually and as Husband and Wife,
16669 Kenmor Road
Kendall, NY  14476

CHARLES T. MOORE and EUGENIA P. MOORE,
Individually and as Husband and Wife,
319 Arnold Avenue
Syracuse, NY  13210

ALFRED MOSACK, Individually,
4230 Ridge Road, Apt. 9
Brooklyn, OH  44144

EARL M. MOSHER and FRANCES A. MOSHER,
Individually and as Husband and Wife,
27999 Route 12 North
Watertown, NY  13601

JOHN NEWMAN and VIRGINIA NEWMAN,
Individually and as Husband and Wife,
834 Bull Creek Road
Laurelville, OH  43135

CHARLES NICASTRO and APRIL NICASTRO,
Individually and as Husband and Wife,
252 Massachusetts Avenue
Buffalo, NY  14213

GUY NORMAN and BONNIE J. NORMAN,
Individually and as Husband and Wife,
7034 State Route 180
Kingston, OH  45644-9592

PATRICK O'DONNELL and SHARON O'DONNELL,
Individually and as Husband and Wife,
10362 Chestnut Road
Dunkirk, NY  14048

MAYNARD OLIN and DEBORAH A. OLIN,
Individually and as Husband and Wife,
2037 Eden Evans Center Road
Eden, NY  14057

STEPHEN OPETT and RITA M. OPETT,
Individually and as Husband and Wife,
74 Canadaigua Avenue
Canadaigua, NY  14424

EFRAIN G. ORTIZ and CYNTHIA SZACH,
Individually and as Husband and Wife,
117 Antelope Street
Dunkirk, NY  14048

LAWRENCE E. PARKHURST and
BEVERLY J. PARKHURST,
Individually and as Husband and Wife,
410 Cole Road
Fulton, NY  13069

MARSHALL PATRICK and
MILLICENT PATRICK,
Individually and as Husband and Wife,
29 Maltby Street
Jamestown, NY  14701

DRAGUTIN PAVLOVIC and BOSA PAVLOVIC,
Individually and as Husband and Wife,
180 Lancaster Street West
Kitchener, Ontario  N2H 4T8
CANADA

RICHARD PICKARD, Individually,
1700-26A Manchester N.W.
Massillon, OH  44647

SAMUEL K. QUARTEY, Individually,
779 Concourse Village East, Apt. 7N
Bronx, NY  10451

JACK QUINN and CATHERINE QUINN,
Individually and as Husband and Wife,
5341 Quail Village Way
Canal Winchester, OH  43110

DONALD RASMUSSEN and DEANN RASMUSSEN,
Individually and as Husband and Wife,
2616 Woodhurst Drive
Faribault, MN  55021

TOM REYNOLDS, Individually,
6 Silk Street
North Valley, NY  13811

RONALD RIPPETH and LOU ANN RIPPETH,
Individually and as Husband and Wife,
120 East Duncan Street
Killbauck, OH  44637

IQBAL RIZVI and SIRAJ A. RIZVI,
Individually and as Husband and Wife,
64 Essex Street, Apt. 23B
New York, NY  10002

ROBERT J. ROBEY, Individually,
12640 Harrison Township Road
Roseville, OH  43777

JOHN W. ROCHFORD, Individually,
333 Barrett Road
Berea, OH  44017

ROBERT ROSAMINO, Individually,
3277 McDonald Avenue
Schenectady, NY  12304

SHERWOOD A. RUSSELL and
SANDRA K. RUSSELL,
Individually and as Husband and Wife,
4521 South Hill Road
Kennedy, NY  14747

14

NORMAN W. SAVAGE and PATRICIA SAVAGE,
Individually and as Husband and Wife,
P.O. Box 56
Plessis, NY  13675

LOUIS SCHIMENTI, Individually,
1812 Atlantic Avenue
Walworth, NY  14568

SALVATORE SCIORTINO, Individually,
43-32 Kissena & 15 N. Blvd.
Caryle - One, Apt. 15-M
Flushing, NY  11355

JULIUS SCURRY, Individually,
184 Lakewood Drive
Kingsland, GA  31548

DEAN L. SIMPSON, Individually,
1001 Stenebrook Drive
Albany, MN  56307

JAMES SMITH and BETTY J. SMITH,
Individually and as Husband and Wife,
1112 Lawrence Road
Macedon, NY  14502

MARVIN SMITH and SIVI SMITH,
Individually and as Husband and Wife,
5674 Garfield Avenue
Maple Heights, OH  44137

JOHN R. SOLTIS and GLORIA M. SOLTIS,
Individually and as Husband and Wife,
4637 Pioneer Trail
Mantua, OH  44255

ROCCO STAGNITTO, Individually,
211 Child Street
Rochester, NY  14611

ROBERT STEWART and CLAIRE STEWART,
Individually and as Husband and Wife,
8 Blueberry Road
Liverpool, NY  13090

15

ROBERT STOWELL, Individually,
631 E. Lake Road
PennYan, NY  14527

RUSSELL F. TACK and JUNE TACK,
Individually and as Husband and Wife,
43582 287th Lane
Aitkin, MN  56431

ROSCOE H. TAYLOR, Individually,
7484 Parker Hill Road
Dansville, NY  14437

WILLIAM L. TAYLOR and JOY K. TAYLOR,
Individually and as Husband and Wife,
218 North Street
Lancaster, OH  43130

ANDRE TELEMARQUE and
MARIE M. TELEMARQUE,
Individually and as Husband and Wife,
470 East 40th Street, 2nd floor
New York City, NY  11203

EDWIN E. TELLIER, Individually,
4 Elmer Street
Lyons, NY  14489

JOSEPH V. THOMAS and TERESA A. THOMAS,
Individually and as Husband and Wife,
319 Concord Drive
Lorain, OH  44052

SAMUEL H. TUBAUGH, JR., Individually,
P.O. Box 92
New Straitsville, OH  43766

BRUCE UNSON, Individually,
23 Pleasant Vale Road
Tivioli, NY  12583

DAN WAGNER, Individually,
P.O. Box 166
Bovey, MN  55709

16

HENRY D. WHITE and SHARON D. WHITE,
Individually and as Husband and Wife,
3222 Vega Avenue
Cleveland, OH 44113

ARDEN WILSON and CAROL WILSON,
Individually and as Husband and Wife,
4361 Hanrahan Road
Campell, NY 14821

RICHARD WOLFGANG, Individually,
7938 Route 417 W.
Bolivar, NY 14715

JAMES H. WRIGHT and JOSEPHINE M. WRIGHT,
Individually and as Husband and Wife,
11084 Lippold Road
Darien Center, NY 14040

FRANK D. WRIGHTMAN, Individually,
33 West Industrial Boulevard
Cumberland, MD 21502

STEPHEN ZWEIG, Individually,
4904 Pine Hill Road
Albion, NY 14411

Attorney Name and Address:

The Barnes Firm, P.C.
Brian A. Goldstein, Esq.
New York Reg. No. 2715019
17 Court Street, 7th Floor
Buffalo, NY 14202
Telephone: 716-854-2020
Facsimile: 716-854-6291
brian.goldstein@thebarnesfirm.com

Attorney Name and Address:

Trepanier & MacGillis P.A
Craig W. Trepanier, Reg. No. 250776
James C. MacGillis, Reg. No. 283812
8000 Flour Exchange Building
310 Fourth Avenue South
Minneapolis, Minnesota 55415
Telephone: 612-455-0500
Facsimile: 612-455-0501
craig@trepanierlaw.com
jmacgillis@trepanierlaw.com

Dated:  December 21, 2005

THE BARNES FIRM, P.C.

By:_____

Brian A. Goldstein, Esq.
New York Reg. No. 2715019
Direct Dial: 716-566-2269
brian.goldstein@thebarnesfirm.com

The Barnes Firm, P.C.
17 Court Street, 7th Floor
Buffalo, New York 14202-3290
Telephone: 716-854-2020
Facsimile: 716-854-6291

TREPANIER & MaCGILLIS P.A.

By:_____

Craig W. Trepanier          James C. MacGillis
Attorney Reg. No. 250776   Attorney Reg. No. 283812
Direct Dial: 612-455-0502  Direct Dial: 612-455-0503
craig@trepanierlaw.com     jmacgillis@trepanierlaw.com

Trepanier & MacGillis P.A.
8000 Flour Exchange Building
310 Fourth Avenue South
Minneapolis, Minnesota 55415
Telephone:  612-455-0500
Facsimile:  612-455-0501
www.trepanierlaw.com

FEB-02-2006  16:54          SMEALEGAL                                    9097351391    P.05/05

State of Minnesota                                                      District Court
Hennepin County                                                 Fourth Judicial District
                                                         Court File Number: 27-CV-06-1296
                                                              Case Type: Product Liability

                                                              Notice of Judicial Assignment-
                                                              General Civil Block Cases

MERCK FROSST CANADA, LTD.
16711 TRANS CANADA HIGHWAY
KIRLAND QUEBEC H9H3L1

**James Austin, Suzanne Austin, Merle E. Barnes, Jeannette M. Barnes, et al. vs Merck & Co., Inc.,
Merck Frosst Canada, Ltd., Does 1 - 100**

Date Case Filed: January 04, 2006
All future papers must include the above file number, name of assigned judge, attorney identification
number, and must otherwise conform to format requirements or they will be returned.

This case is assigned the following judicial officer for all further proceedings:

          District Court Judge Janet N. Poston
          300 South Sixth Street, C-1251
          Minneapolis, MN 55487-0422
          612-596-6537

**Parties:**   If you receive this notice and have obtained an attorney, notify him/her of this assignment
               immediately.

**Attorneys:** Only the first listed attorney for a party is being sent this notice. If you are the attorney
               receiving this notice, contact all other attorneys representing your party of the judge
               assignment and requirements.

All future hearings and trial dates will be scheduled by the courtroom staff.

Informational Statements, if required, are due within sixty days of initial case filing.

A notice to remove this judicial officer must comply with Minnesota Rules of Civil Procedure 63.03 and
Minnesota Statute § 542.16.

Failure to timely file any required document or other failure to comply with the General Rules of Practice for
the District Courts may result in the impositions of sanctions, including possible dismissal of the case or
striking of the Answer.

The Minnesota Supreme Court has adopted time objectives for the disposition of civil cases. The Fourth
Judicial District adheres to these objectives which are: 90% of the cases should be disposed of within 12
months, 97% within 18 months, and 99% within 24 months of filing.

Dated: January 27, 2006                    Mark S. Thompson
                                           Court Administrator
                                           Hennepin County District Court

cc:  CRAIG WILLIAM TREPANIER
     Merck & Co., Inc.

M004263169